UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

ROMANDO DESHONE SMITH,

                Petitioner,                Case No. 1:08-cv-26

v.                                       Honorable Paul L. Maloney

CARMEN PALMER,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a bench trial in the Kalamazoo County Circuit Court, Petitioner was convicted of being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, armed robbery, MICH. COMP. LAWS § 750.529, assault with intent to commit murder, MICH. COMP. LAWS § 750.83, and two counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. On October 14, 2002, Petitioner was sentenced as a third habitual offender, MICH. COMP. LAWS § 769.10, on the respective offenses to terms of 7 to 10 years, 18 to 60 years, 30 to 60 years, and two consecutive terms of 2 years. In his *pro se* petition, Petitioner raises six grounds for relief, as follows:

    I.      WHETHER THE PROSECUTOR PRESENTED INSUFFICIENT EVIDENCE REGARDING THE ELEMENT OF IDENTIFICATION TO SUPPORT DEFENDANT'S CONVICTION OF ROBBERY ARMED?

    II.     WHETHER THE PROSECUTOR PRESENTED INSUFFICIENT EVIDENCE REGARDING THE ELEMENT OF INTENT TO SUPPORT DEFENDANT'S CONVICTION OF ASSAULT WITH INTENT TO MURDER?

III.    APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL CONTRARY TO HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS, WHEN COUNSEL FAILED TO PERFORM THE DUTIES AS OUTLINED BELOW[.]

      A.    Counsel was ineffective for failure to investigate, locate, interview, and call Kenny O'Day as an alibi witness, failure to present an alibi defense, and failure to pursue exculpatory documentary evidence[.]

      B.    Counsel was ineffective for failure to present a self-defense theory, and for failure to call George Jones to support the self-defense[.]

      C.    Counsel was ineffective for failure to call an independent ballistic expert at trial[.]

IV.    APPELLANT WAS DENIED EFFECTIVE APPELLATE COUNSEL WHEN SAID COUNSEL FAILED TO RAISE THE ENCLOSED "DEAD BANG WINNER" ISSUES ON HIS APPEAL OF RIGHT[.]

V.    THIS COURT SHOULD REACH THE MERITS OF APPELLANT'S CONSTITUTIONAL CLAIMS, WHERE THE COMPLAINED OF VIOLATIONS HAVE RESULTED IN THE CONVICTION OF ONE WHO IS ACTUALLY INNOCENT[.]

VI.    APPELLANT ASSERTS THAT INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS ARE PROPERLY BROUGHT FOR THE FIRST TIME ON COLLATERAL REVIEW[.]

(Pet., Attach. C, docket #1-4.)  Respondent has filed an answer to the petition (docket #10) stating that the grounds should be denied because they are procedurally defaulted and have no merit.  Upon review and applying the AEDPA standards, I find that the grounds are without merit.  Accordingly, I recommend that the petition be denied.

<u>**Procedural History**</u>

**A.      Trial Court Proceedings**

The state prosecution arose from an armed robbery that took place in Kalamazoo in

September 2001 and a shooting that followed three months later, both involving the same victim,

Denver White.  Petitioner was charged with one count each of assault with intent to commit murder,

armed robbery, and being a felon in possession of a firearm, and two counts of felony-firearm related

to the armed robbery and the assault with intent to commit murder charges.  Following a preliminary

examination on June 12, 2002, he was bound over on all charges.  A supplemental information was

filed on June 20, 2002, charging Petitioner as a habitual offender, second offense.  Petitioner was

tried before the bench beginning September 11, 2002, and concluding on September 19, 2002.

Dr. Thomas Rudek testified as an expert in emergency medicine.  (Tr. I, 17.)  In

December 2001, Dr. Rudek treated Denver White, who was brought to the emergency room with

two gunshot wounds.  One wound went from the outside front of his thigh to the inside, lower part

of his thigh. (Tr. I, 18-19.)  Because the bullet both entered and exited the leg, and because no bullet

or casing fragments were found, Dr. Rudek was unable to determine the caliber of the weapon that

created the wound.  (Tr. I, 20.)  The second gunshot wound was to the back, entering just over the

aspect of the scapula.  (Tr. I, 21.)  Any such wound entering from the back in the area of the thorax

placed at risk various vital organs and great blood vessels and was potentially life threatening.  (Tr.

I, 22.)  A chest x-ray revealed a foreign body in the back near the midline.  (Tr. I, 22.)  The bullet

had apparently bounced off the patient's scapula and then tracked up into the middle of the back.

(Tr. I, 26.)  Dr. Rudek anesthetized the patient and made a circular incision to remove the object,

which was a casing from a bullet. (Tr. I, 23-24.) Although neither wound in this patient was life-threatening, both had the potential to be. (Tr. I, 24.)

Officer Gretchen Mayo of the Kalamazoo Department of Public Safety testified that she was called to the area of Interfaith Homes on the afternoon of December 16, 2001, in response to a call regarding a shooting victim at 1042 Interfaith, Apartment A. (Tr. I, 32.) She and Sergeant Weston were the first on the scene. (Tr. I, 33.) They found a young man sitting on the couch complaining of pain to his right leg and left shoulder and reporting that he had been shot. LIFE Ambulance personnel arrived and began attending to the victim's needs and preparing to transport him. The officers looked at the bullet wounds. (Tr. I, 33.) Also present were the residents of the apartment, with whom Mayo had no further contact. (Tr. I, 33-34.) She helped load the victim into the ambulance and followed the ambulance to the hospital. (Tr. I, 34.) She interviewed the victim at the hospital. The victim was alert and conscious, but visibly shaken and worried. (Tr. I, 34.) Mayo went into the treatment room with the victim and was present when Dr. Rudek removed the object from the victim's back. (Tr. I, 35.) She logged the item into evidence and put a lab analysis form with it so that it could be tested. (Tr. I, 35-36.) She identified Exhibit 1 as the envelope she prepared on which she indicated the contents as a slug from, possibly, a nine millimeter weapon that was taken from the victim's left shoulder. (Tr. I, 36.)

Sergeant Todd Weston testified that he was working as a zone sergeant at about 3:30 p.m. on December 16, 2001, when he was called to Apartment 1042A of the Interfaith Homes, responding to a call reporting that a victim of a shooting was there. (Tr. I, 45, 48.) As zone sergeant, Weston was responsible for scene supervision and accountability of officers. (Tr. I, 45.) Weston immediately checked the condition of the victim. A woman was applying pressure to a

wound, and, upon examination, Weston found a second wound. LIFE Ambulance responded shortly thereafter and took control of treatment. (Tr. I, 46-47.) While the ambulance personnel were attending to the victim, Weston directed other officers as they attempted to locate the scene of the shooting and identified and interviewed witnesses. (Tr. I, 47.) Weston himself searched the area near where the victim was sitting, interviewed a couple of witnesses and then went to the apparent scene of the shooting. (Tr. I, 47-48.) At the scene, Weston saw about four shell casings laying on the ground, and he saw a divot in the dirt, where it looked like a slug had penetrated the ground. (Tr. I, 49.) He also saw a muddy area in the sod where it looked like someone had spun out or fallen. (Tr. I, 49.) An evidence officer, Ron Holmes, came to the scene to collect evidence. (Tr. I, 49-50.) Weston then obtained consent from the victim's girlfriend and searched the victim's apartment, number 1044C, which was only about 60 feet from the apartment in which the victim was sitting. (Tr. I, 50, 55.) Weston found no weapons or contraband in the victim's apartment. (Tr. I, 52.)

Michigan State Police Detective Sergeant Jeffery Crump testified as an expert in firearm identification. (Tr. I, 68.) Crump testified that he received a metal jacket from a fired bullet and a metal jacketed bullet that was substantially intact. (Tr. I, 69-70, 72, 77.) Jacketed bullets typically are used in semi-automatic weapons because they provide greater reliability in feeding. (Tr. I, 69-70.) He examined the jackets to determine, if possible, whether they were fired from the same weapon and what caliber of weapon was used. (Tr. I, 70.) He measured the lands and grooves to determined the source of weapon. (Tr. I, 71.) They appeared to be most likely a .38 caliber, but was consistent with a .357 caliber. (Tr. I, 71.) The jacket was consistent with a Winchester Brand Silver Tip Hollow Point and, using the weight of the item, it appeared to be consistent with the Winchester 110 grain .38 Special, Silver Tip Hollow Point. (Tr. I, 71-72.) He also determined

based on both rifling class characteristics such as the number and width of lands and grooves and individual microscopic examination that both the jacket and the jacketed bullet were fired from the same weapon. (Tr. I, 73.) Crump testified that they were not consistent with the nine millimeter cartridge cases found at the scene. (Tr. I, 74-75.) According to Crump, a metal jacket typically will separate from the bullet only after it strikes something of significance, causing the bullet to deform. (Tr. I, 77.) A .38 caliber bullet is approximately the same diameter as a nine millimeter bullet. Usually, .38 caliber bullets are used in a revolver pistol, not in a firearm that would automatically eject the cartridge. (Tr. I, 79.) In contrast, most nine millimeters are semi-automatics that eject cases, generally to the right. (Tr. I, 79.)

Kalamazoo Police Officer Terry Thomas testified the he was called to Interfaith Homes on December 16, 2001. During the course of his duties at the scene, he located two shell casings laying on a concrete patio area, and he advised Sergeant Sanderson, so that the area around the casings could be taped off. (Tr. I, 90.)

Ronald Holmes was a crime scene technician for the Kalamazoo Department of Public Safety in December 2001. (Tr. I, 96.) He was dispatched to 1042 Patwood Court in the area of Interfaith Homes. (Tr. I, 97.) Officer Thomas pointed out two shell casings that he had located. Holmes continued to search the area in front of 1044 Patwood and located some additional shell casings, a jacket of a bullet and some torn up turf. (Tr. I, 97.) Holmes put evidence markers by the evidence, took photographs, collected the evidence and made a diagram of the scene. (Tr. I, 97.) He then brought the evidence back to the lab and put it in the evidence locker. (Tr. I, 97-98.) Holmes identified in his diagrams the buildings in the area and the location of the shell casings. (Tr.

I, 100.)  Homes also identified in the photographs location of each of the shell casings and the bullet jacket, as well as the area of torn up turf.  (Tr. I, 101-05.)

Charlotte Warren testified that she lived in Interfaith Homes, Apartment 1042A.  She had known the victim, Denver White, for about three months.  (Tr. I, 112.)  Her boyfriend, Gary Harris, and her five children also lived at the address.  (Tr. I, 112.)  She did not see White very frequently, as he did not come outside his house very often.  (Tr. I, 113.)  In September 2001, she saw from her kitchen window two individuals with a gun who were demanding that Denver White given them his money.  (Tr. I, 114-15.)  She watched the entire incident, but she did not do anything because she did not want the two robbers to notice her looking out the window.  (Tr. I, 116.).  She saw the robbers run across the field.  After the robbery, Denver White came to Warren's door.  (Tr. I, 118.)

A few months later, while looking out her back picture window, she saw White come running across the field toward her apartment.  He was being chased by two men.  (Tr. I, 119.)  The men were shooting at Denver White.  (Tr. I, 120.)  Warren was in the house with her boyfriend, her children, and a couple of friends.  (Tr. I, 127.)  She took her children upstairs and came back downstairs.  (Tr. I, 126.)  She saw White go down to the ground, and he was crawling to her apartment building.  (Tr. I, 121.)  She could hear gunshots being fired.  (Tr. I, 121-22.)  Warren heard only one grouping of, possibly, five or six shots.  (T. I, 145.)  She saw that one of the individuals chasing Denver White had a black handgun.  (Tr. I, 144.)  Denver White got to his feet again when he was right in front of Warren's porch.  (Tr. I, 125.)  White came to Warren's door and asked for help, saying he was shot.  (Tr. I, 127.)  White came into the house and Warren started to help him.  She asked if he wanted an ambulance, and she called as soon as he agreed.  (Tr. I, 127,

32.)  She got a wet towel and took his shirt off so that she could see where he had been hit on the back.  She did not know he also was hit in the leg until the ambulance came.  (Tr. I, 127.)  During the entire course of the incident, she at no time saw Denver White with a gun.  (Tr. I, 122, 128.)  When White came to her house after both events, he used the same names to describe the perpetrator.  (Tr. I, 129.)  After the robbery, White was angry, but after the shooting, he was scared and shaking.  (Tr. I, 131.)  White told Warren that Shawn and Little George were the ones who attacked him.  (Tr. I, 133.)  Once the police arrived, Warren gave them permission to search her apartment.  (Tr. I, 133.)  At some point, Warren talked to Sergeant Weston, who told her that someone had indicated that White had a gun.  Warren testified that she did not see White with a gun and she told Weston that.  (Tr. I, 134.)  Warren testified that she could not describe either of the individuals chasing White, as they were too far away.  (Tr. I, 135.)  At the time of the incident, Warren's boyfriend, Gary Harris, was at the house, as were his brother, Brian Harris, and Warren's friend, Teela Arkwright.  (Tr. I, 138.)

Gary Harris testified that, beginning in March 2001, he had lived with Charlotte Warren and her children at 1042 Interfaith, Apartment A.  (Tr. I, 150.)  He met Denver White shortly after moving into the apartment.  White lived in an apartment located 25 or 30 yards from Harris' address.  (Tr. I, 151.)  Harris saw White almost daily, as White's car was usually parked by Harris' house, so Harris would see White go in and out. (Tr. I, 151-52.)  On December 16, 2001, White dropped by Harris' apartment to see what was going on.  (Tr. I, 152-53.)  White told Harris that he had just come from his sister's house, which was in another part of the complex.  (Tr. I, 167.)  Harris and White stood on the porch talking for a minute or so before White left.  (Tr. I, 152-53, 158.)  Charlotte Warren came outside at some point, as, possibly, did others.  (Tr. I, 154.)  From his porch,

Harris could see the whole side of the complex, past White's building and to the office, which lies on the other side of White's building. (Tr. I, 153.) While standing on the porch, Harris saw a couple of men cutting across the circle drive. He knew one of the men and had seen the other before. (Tr. I, 156-57.) The shorter man was called George. The other man was tall, slender and brown-skinned. Harris could not affirmatively identify him as Petitioner. (Tr. I, 157-58.) Denver White saw the men approaching across the lot and left, going toward his own apartment. (Tr. I, 159, 168.) The two men went to the left. (Tr. I, 159.) Just after Harris turned to go back into his house, he saw Denver White turn and head back toward Harris' house. As soon as he got inside, Harris heard gunshots. (Tr. I, 159.) Harris testified that he heard several rounds fired but he did not see the shooter. (Tr. I, 170.) He could see out his blinds that White was trying to get out of the way of the gunfire. (Tr. I, 159.) White then ran toward Harris' house. (Tr. I, 160.) According to Harris, when Denver White was trying to avoid the gunshots, he was located in the same place the police found the cartridge casings. (Tr. I, 160.) As White ran to Harris' house, he slipped or otherwise fell near a tree outside his apartment. (Tr. I, 160.) Harris could not see if White had a gun. (Tr. I, 160.) White moved quickly toward Harris' house, and he did not have a gun when he arrived. (Tr. I, 161-62.) Harris hesitated momentarily before opening the door, as he feared for the children's safety. (Tr. I, 162.) Only two or three minutes elapsed between when White left Harris' house and when White returned after having been shot. (Tr. I, 163.) Harris and Warren helped White to the couch and White told them his leg had been shot. White did not appear to realize that he also had been shot in the back. (Tr. I, 165.) Harris and Warren got towels, and Harris called 911. (Tr. I, 165.)

Detective Sergeant Jeffery Crump returned to the witness stand to clarify his earlier testimony. After testifying the day before, Crump returned to his office to check the Winchester

ammunition catalog to determine whether Winchester did, in fact, make a nine millimeter caliber in the Silver-Tip hollow points consistent with the cartridge casings he had previously examined. He discovered that Winchester did make the nine millimeter in that type of ammunition. (Tr. II, 182.) The weight of the nine millimeter at 115 grains was fairly consistent with the weight of the mostly intact bullet he had examined, which weighed 108 grains. (Tr. II, 183.) The Winchester Silver-Tip .38 caliber bullet weighs 110 grains. He had earlier been led to conclude that the casings he examined had a cannelure, which is a ridge on the outside of the jacket of the bullet that typically holds a bullet and will usually be found on a revolver cartridge or bullet. After Crump did further research, he discovered that both the nine millimeter and the .38 caliber cartridges had the cannelure. (Tr. II, 184.) The further research led Crump to change his opinion to reflect that the type of weapon could have been not only a .38 caliber weapon, but also a nine millimeter or the .357 caliber weapon. (Tr. II, 187.) With that in mind, Crump looked again at the lands and grooves database and found that Smith and Wesson also makes a variety of semi-automatic pistols with the same rifling characteristics. As a result, he could not rule out a nine millimeter, a .357 caliber or a .38 caliber weapon. (Tr. II, 188.)

Denver White testified that he was 22 years old and lived at 1044 Interfaith, Apartment C. (Tr. II, 195.) White testified that he did not know Petitioner, though he knew of him and knew his name to be Shawn Oak or Shawn O. (Tr. II, 195-96, 197.) White had heard of Petitioner years before, while Petitioner was incarcerated. (Tr. II, 196.) According to White, on the night of September 26, 2001, he was robbed by Petitioner. (Tr. II, 196-97.) At the time, White was near his own house, just outside Gary Harris' house. (Tr. II, 197.) White was standing and talking to some other guys and he turned to go home. Petitioner and a man named Kenny sneaked up on

White. Both Shawn and Kenny were carrying guns, as was a third man, who had two guns. (Tr. II, 197-98.) Petitioner and Kenny pointed their guns at White, and Petitioner reached into White's pocket and robbed him. (Tr. II, 197-98.) White identified Petitioner in court. (Tr. II, 197.) Kenny had a handgun, which he pointed into White's face. Petitioner had a shot gun and held it to his side. (Tr. II, 199.) Approximately $450 or $460 was taken from White during the robbery. (Tr. II, 199.) The robbers told White to run. (Tr. II, 199.) Because he was angry, White did not really run, he just jogged out into the open and screamed, "[T]hese niggers just robbed me." (Tr. II, 200.) He then ran toward his girlfriend's sister's house on the other side of the complex. (Tr. II, 201.) When he arrived, he told her that he had been robbed and by whom. (Tr. II, 202.) White did not call the police because he knew who had robbed him and thought at first that he would take care of it himself. After reflection, he thought better of it. (Tr. II, 202.) White knew Kenny O'Day through O'Day's brother. (Tr. II, 202.) He also knew Petitioner's sister and knew Petitioner was just getting out of jail. That fact also inclined White not to report the incident. (Tr. II, 203.) After the robbery, Petitioner's sister came over and asked if Petitioner had robbed White. White decided to leave it alone. (Tr. II, 203.)

White did not see Petitioner for some time after that. In December 2001, White was stopped at a light while driving with his girlfriend's father. (Tr. II, 204.) Little George and Petitioner, Shawn O, rode up beside the stopped car. White began to argue with Little George, and Little George and Petitioner began to smile and make insulting remarks and rude hand gestures. (Tr. II, 203-04.) White got very angry. (Tr. II, 204-05.) When the light changed, White continued to drive straight and George turned left. White told his girlfriend's father that he "was going to whoop his ass." (Tr. II, 205.) On the day of the shooting, White again saw Little George. When White

pulled up in a car at his girlfriend's sister's house, he saw Little George in front of the apartment in which George lived. (Tr. II, 205-06.) Petitioner walked his daughter up to her aunt's house and told her that he was going back home. When he came out from between the buildings, George was still there, smirking at White. White walked over and hit George three or four times, telling George he had to quit doing "this ho shit." (Tr. II, 205-06, 227.) George did not really fight back, as he was not a big person. (Tr. II, 206.) White was upset by George's taunts, as he and George had always been friends. (Tr. II, 227-28.) After he punched George, White saw Petitioner coming across from his grandfather's house. White got back into his car and drove toward his own apartment. (Tr. II, 207.) He parked his car at the location nearest his door, which was in front of Harris' apartment. (Tr. II, 208.) When he parked, Gary Harris was outside, and White told him what had happened between White and George. (Tr. II, 207.) As he was speaking with Harris, he saw Petitioner and George coming from where George lived, at the front of the complex. (Tr. II, 207-08.) Petitioner started to move quickly behind the building. (Tr. II, 211.) At that point, White began to go toward the back to get to his own house. When he got near his porch, he had his keys in his hand. Petitioner began shooting at him. (Tr. II, 212, 231.) White turned around and took off toward Gary Harris' house, which was 30 or 40 feet away. (Tr. II, 212-13.) When he turned, he fell to the ground. He got up and began to run again. (Tr. II, 214.) As he ran, he looked between the buildings of 1046 Interfaith and 1042 Interfaith, and he saw Petitioner running that way. (Tr. II, 214.) He knocked on Gary Harris' door, which was opened immediately. (Tr. II, 214.) White did not realize that he had been shot until Charlotte Warren told him. (Tr. II, 214.) After he sat down in Harris and Warren's house, he saw blood and began panicking. He told Harris and Warren to call the police. (Tr. II, 215.) According to White, he did not see George again after he first noticed Petitioner start

to move behind the building.  (Tr. II, 215.)  White denied having a gun at the time of the shooting.  (Tr. II, 215.)  White recalled hearing more than three or four shots.  (Tr. II, 232.)  White testified that he saw Petitioner shooting a handgun.  (Tr. II, 231, 233.)  White could not describe the handgun or identify what type it was.  (Tr. II, 233.)

White eventually was taken to the hospital.  He had two gunshot wounds to his back and his right leg, as well as a graze on his right wrist.  (Tr. II, 216.)  White estimated that the whole incident, from the time he saw Petitioner cutting behind the building to the time he got back to Harris' house was only a couple of minutes.  (Tr. II, 216.)  White was unable to say precisely how much money had been stolen from him during the robbery.  His mother had sent him $500, but he had spent some of it.  (Tr. II, 217.)

Sergeant Todd Weston was recalled as a witness.  (Tr. II, 242.)  He clarified that his report had been made from brief notes taken at the Harris-Warren apartment.  (Tr. II, 243.)  According to Weston, Warren reported seeing only one person, whom she could not identify, coming across the field.  (Tr. II, 243.)  Weston also testified that Harris had denied seeing anyone coming from that direction.  (Tr. II, 242.)

Kalamazoo Police Detective Steven Ouding testified that he investigated the shooting that occurred on December 16, 2001, which eventually led to an investigation of an armed robbery, as well.  (Tr. II, 248.)  Ouding testified that he participated in presenting a photographic lineup that was prepared by Detective Alofs.  (Tr. II, 249.)  Petitioner's photograph was included among the six photographs in the lineup.  (Tr. II, 250.)  Ouding showed the lineup to Denver White, who picked Petitioner without hesitation.  (Tr. II, 251.)   On cross-examination, Ouding testified about the statement White gave to Ouding about the shooting.  Ouding testified that White told him that, when

he went toward his apartment, he saw both Petitioner and Little George standing next to a tree by the apartment. (Tr. II, 255.) According to Ouding, White also stated that he saw Petitioner raise what White believed to be a nine millimeter semi-automatic pistol. (Tr. II, 256.) Ouding recalled that White also told him that, when he turned and ran, he was hit in the back by one of the shots. (Tr. II, 256.)

At the conclusion of trial, on September 19, 2002, the court found Petitioner guilty of assault with intent to commit murder, possession of a firearm during the commission of the assault, armed robbery, possession of a firearm during the commission of the armed robbery, and felon in possession of a firearm. (Tr. III, 282-84.) On October 14, 2002, Petitioner was sentenced as an habitual offender to serve respective terms of 30 to 60 years, 2 years, 18 to 60 years, 2 years, and 7 to 10 years. (Sentencing Transcript, (S. Tr.), 15-17, docket #13.)

**B.    Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on April 10, 2003, raised two issues: (1) whether the prosecution had presented sufficient evidence regarding identification to support the armed robbery conviction; and (2) whether the prosecution had presented sufficient evidence of the intent required to prove assault with intent to commit murder. (See Def.-Appellant's Br. on Appeal, docket #14.) By unpublished opinion issued on February 19, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (See 2/19/04 Mich. Ct. App. Opinion (MCOA Op.), docket #14.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims raised before and rejected by the Michigan Court of

Appeals. By order entered July 29, 2004, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #17.)

### C. Post-conviction relief

On May 19, 2005, Petitioner attempted to file in the Kalamazoo County Circuit Court a motion for relief from judgment under MICH. CT. R. 6.500. The pleadings were rejected by the circuit court as being in excess of the page limit for motions under MICH. CT. R. 2.119(A)(2). Petitioner filed a motion seeking leave to file an oversized brief on July 15, 2005, which was denied by the Court on July 27, 2005. The court denied Petitioner's motion for reconsideration on August 18, 2005. (*See* Def's App. for Leave to Appeal, docket #15; Cir. Ct. Docket Sheet, 3, docket #22.) Because of the restriction on the length of his motion, Petitioner was forced to limit his arguments in order to file a brief within the page limits. He filed his reduced motion on September 15, 2005, and it was denied by the court on September 16, 2005. (*Id.*)

Petitioner appealed to the Michigan Court of Appeals, arguing that MICH. CT. R. 2.119(A)(2) did not apply to motions for relief from judgment and that he had been denied a fair opportunity to present his motion for relief from judgment by the trial court's improper limitation. The court of appeals ordered the case remanded on April 6, 2006, holding that the form of motions for relief from judgment was governed by MICH. CT. R. 6.502, which contains no page limitation. (4/6/06 MCOA Ord., docket #15.)

On May 1, 2006, Petitioner filed a new motion and brief in support of relief from judgment. In his motion, Petitioner raised grounds three through six of his habeas petition. That

same date, he also filed a motion to disqualify the judge and a motion for a *Ginther*[1] hearing under MICH. CT. R. 6.508(C). The circuit court denied the motions on January 8, 2007, holding that Petitioner had failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D). Petitioner sought leave to appeal to both the Michigan Court of Appeals and the Michigan Supreme Court, raising the same grounds. Both courts denied leave to appeal on the basis of MICH. CT. R. 6.508(D). The supreme court order was issued on November 29, 2007.

Petitioner filed the instant petition on or about January 7, 2008.

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

---

[1] *People v. Ginther*, 212 N.W.2d 922, 925 (Mich. 1973) (holding that a defendant who wishes to raise claims on appeal for which an evidentiary record is not adequately preserved should seek an evidentiary hearing in the trial court and, if necessary, file a motion for remand in the court of appeals to hold such hearing).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);  *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

In his habeas application, Petitioner sets forth six grounds for relief.  The first two grounds challenge the sufficiency of the evidence to support his convictions for armed robbery and assault with intent to murder.  Grounds Three and Four assert that he received ineffective assistance of counsel at trial and on appeal, respectively.  Grounds Five and Six are not substantive grounds for relief.  Instead, in Ground Five, Petitioner asserts that his actual innocence excuses the procedural default of his ineffective-assistance-of-counsel claims.  Ground Six asserts that Petitioner's claim of ineffective assistance of appellate counsel was properly raised on collateral review and should not be considered defaulted.

I.        Sufficiency of the Evidence: Grounds One and Two

Petitioner argues that the prosecution failed to present sufficient identification evidence to prove beyond a reasonable doubt that Petitioner was the perpetrator of the armed robbery.  Petitioner also contends that the prosecution failed to present sufficient evidence of his intent to kill to support his conviction for assault with intent to murder.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

### A.    Armed robbery

The elements of armed robbery are (1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute. *People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999). Petitioner's sole argument concerns the adequacy of the prosecution's evidence that Petitioner was the perpetrator of the September 2001 armed robbery.

The Michigan Court of Appeals addressed the issue as follows:

> Defendant acknowledges that the complainant plainly identified him as among those who robbed him in September 2001. However, defendant points out that the complainant testified that he was approached by three armed robbers, and that they took money from him without speaking, and protests that another eyewitness testified that there were only two assailants, only one of whom was armed, but both of whom gave the complainant verbal commands. Defendant additionally cites scanty authority for the proposition that eyewitness identification is not always reliable. These arguments are unavailing.

"Credibility is a matter for the trier of fact to ascertain. We will not resolve it anew." *People v Vaughn*, 186 Mich App 376, 380; 465 NW2d 365 (1990) (citation omitted). Moreover, all conflicts in the evidence must be resolved in favor of the prosecution. *People v Terry*, 224 Mich App 447, 452; 569 NW2d 641 (1997). We are not about to rule, as a matter of law, that a factfinder may not choose to believe one witness' identification testimony, and come to a legally sound conclusion on the basis of it, even where contradicted by others. The accounts of a single witness can suffice to persuade a jury of a defendant's guilt beyond a reasonable doubt. See *People v Jelks*, 33 Mich App 425, 432-433; 190 NW2d 291 (1971). Even where the witnesses' identification of the defendant is less than positive, the question remains one for the trier of fact. *People v Abernathy*, 39 Mich App 5, 7; 197 NW2d 106 (1972). In this case, the complainant's unequivocal identification of defendant as among the armed persons who robbed him on the occasion in question was sufficient to support the trial court's finding in that regard.

(2/19/04 MCOA Op. at 2-3, docket #14.)

The state court's determination was patently reasonable. Issues of credibility are matters strictly for the trier of fact and are not properly reviewed by a federal court considering a habeas petition. *Herrera*, 506 U.S. at 401-02. By Petitioner's own admission, White unequivocally identified Petitioner as one of the perpetrators of the robbery. Regardless of whether some evidence challenged White's credibility, the trial court, as factfinder, was entitled to believe White's testimony. If believed, White's identification of Petitioner was ample evidence upon which to find Petitioner guilty beyond a reasonable doubt. As a consequence, the decision of the court of appeals constitutes a reasonable application of established Supreme Court precedent.

## B.      Assault with intent to commit murder

In Ground Three of his habeas application, Petitioner asserts that the prosecution failed to introduce sufficient evidence that Petitioner had the requisite intent to kill to support his conviction for assault with intent to commit murder. "The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." (2/19/04 MCOA Op. at 3 (citing *People v. McRunels*, 603 N.W.2d 95, 102 (Mich.

Ct. App. 1999), docket #14.)  Under Michigan law, "[a]n actor's intent may be inferred from all of the facts and circumstances, and because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v. Fetterley*, 583 N.W.2d 199, 203 (Mich. Ct. App. 1998), *quoted in People v. Gonzalez*, 663 N.W.2d 499, 509 (Mich. Ct. App. 2003).  The weaponry used in a crime can constitute evidence of both preparation and intent.  *See People v. Kramer*, 303 N.W.2d 880, 886 (Mich. Ct. App. 1981); *People v. Miner*, 177 N.W.2d 719, 721 (Mich. Ct. App. 1970).  In addition, evidence of the injuries inflicted may also constitute evidence of an intent to kill.  *People v. Mills*, 537 N.W.2d 909, 915 (Mich.), *mod. on other grounds*, 539 N.W.2d 504 (Mich. 1995).

Applying this standard, the court of appeals held as follows:

In this case, the complainant's plain account of defendant firing several shots in his direction, and the evidence establishing that the complainant was injured by two bullets, one of which struck the chest through the back, well supports the trial court's conclusion that defendant acted with a specific intent to kill.

Again, defendant protests that another eyewitness' testimony contradicted that of defendant in certain respects, so again we state that we defer to the trier of fact to resolve credibility contests.  *Vaughn, supra* at 380.  And all conflicts in the evidence must be resolved in favor of the prosecution.  *Terry, supra* at 452.

Defendant further points out that the complainant did not provide perfectly consistent accounts himself throughout the course of the investigation and trial, and that ballistics analysis at first identified a caliber of bullet that did not agree with the four shell casings found where the complainant fell.  Defendant further suggests that those four casings were expelled from a semiautomatic weapon that the complainant had fired.

Defendant "vehemently denies participation in the shooting," yet lapses into a self-defense argument on appeal.  Defendant similarly suggests for the first time on appeal that this may have been an intentional shooting in response to sufficient provocation as to constitute manslaughter instead of murder.  The incongruity between denying the shooting while asserting that the shooting was justified is plain on its face.  Defendant chose to maintain at trial that he did not participate in the shooting.  Regardless, as defendant notes in his appellate brief, the assault and

- 21 -

attempted killing must occur under circumstances which, had the victim been killed, would constitute murder. The complainant's testimony, however, indicates that defendant was not provoked or justified with respect to the shooting, and the complainant was shot in the back. Because we view the evidence in a light most favorable to the prosecution, with credibility issues reserved for the trier of fact, and because all conflicts in the evidence are to be resolved in favor of the prosecution, we find that there was sufficient evidence to support a finding that, had defendant killed the complainant as intended, the killing would have constituted murder.

(2/19/04 MCOA Op. at 3-4.)

The state court's determination constitutes a reasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(D). Here, the victim testified that defendant shot at him multiple times, and the victim received gunshot wounds in the back and in the right leg. Clearly, firing a gun multiple times at a person raises a reasonable inference that the assailant intended to kill. *See Kramer*, 303 N.W.2d at 886. Moreover, the examining physician's testimony clearly indicated that a wound to either area, particularly the wound to the back of the chest cavity, had the potential to be life threatening. As previously discussed, the nature of the injury may be relevant to determining whether a petitioner possessed an intent to kill. *Mills*, 537 N.W.2d at 915. The nature of White's injuries strongly suggested that Petitioner possessed the requisite malice to warrant conviction for assault with intent to commit murder. In sum, the facts and circumstances surrounding the shooting, taken in the light most favorable to the prosecution, were sufficient to raise an inference that Petitioner possessed the requisite intent to kill. *See Fetterley*, 583 N.W.2d at 203.

II.     Ineffective Assistance of Counsel: Ground III

In his third ground for habeas relief, Petitioner argues that his trial attorney was ineffective in three ways: (1) by failing to investigate, locate, interview or call Kenny O'Day as an alibi witness on the armed robbery charge; (2) by failing to present a self-defense theory and failing

to call George Jones to support that theory; and (3) by failing to call an independent ballistics expert at trial.[2]

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that

---

[2]Plaintiff raised his claims of ineffective assistance of counsel in his motion for relief from judgment, and the Michigan courts declined to address the merits because Petitioner had failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D). When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). However, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error

had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a

mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application"

prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

### A.  Failure to Locate or Call Kenny O'Day

Petitioner contends that he was not guilty of the armed robbery offense, and he argues

that counsel was ineffective in failing to find, interview and present the testimony of Kenny O'Day,

who Denver White identified as participating in the robbery with Petitioner. He asserts that Kenny

O'Day would have admitted to the offense and would have exculpated Petitioner in the crime. In

support of his assertion, he provides the affidavit of Kenny O'Day, signed on April 25, 2005, nearly

three years after Petitioner's trial. (O'Day Aff., Ex. E to Pet., docket #1-6 at 41.) O'Day avers that

he and individuals known only as "Rob" and "E" actually robbed Denver White on or about October

1, 2001. According to O'Day, Petitioner did not participate in the robbery. (*Id.*)

O'Day's affidavit falls far short of supporting Petitioner's claim of ineffective

assistance of counsel. First, as Petitioner acknowledges in his brief, at the time of Petitioner's

conviction, O'Day was charged with the armed robbery. That charge was later dismissed when

O'Day agreed to plead guilty to another offense. (Facts in Supp. of Pet., Ex. D to Pet. at 13, docket

#1-5.) In other words, at the time of Petitioner's trial, O'Day was himself at risk of conviction on

the charge. Substantial issues governing his Fifth Amendment rights would have arisen had defense

counsel attempted to extract O'Day's self-incriminating testimony at Petitioner's trial. Moreover,

at no place in his affidavit does O'Day indicate that he would have testified at Petitioner's trial in

accordance with his affidavit. Indeed, the affidavit suggests to the contrary, indicating that, in

offering the affidavit, O'Day "want[ed] to get this off my chest as well as my mind . . . ."  (O'Day

Aff., Ex. E to Pet., docket #1-6 at 41.)

Petitioner therefore has failed to overcome the strong presumption that counsel's

performance was strategic.  *Strickland*, 466 U.S. at 689.  Moreover, because he has failed to show

that O'Day would have provided any useful testimony, he cannot demonstrate the requisite

prejudice.  *Id.*

**B.     Failure to Present a Self-Defense Theory**

Petitioner argues that his trial attorney was ineffective in failing to pursue a theory

of self-defense and in failing to call George Jones as a witness in support of that theory.  His claim

is wholly meritless.

At trial, Petitioner pursued the theory that he was not involved in the shooting of

Denver White in any way.  Trial counsel clearly pursued that theory as a strategic matter.  The

evidence suggest that George Jones was beaten by the complainant shortly before the shooting and

was in the vicinity at the time White was shot.  Based on this evidence, counsel's decision to pursue

the theory that Jones had a motive to shoot White and was the more likely shooter clearly constituted

a reasonable strategic choice.  (Tr. I, 12.)  Having pursued that theory, counsel would have

completely undermined his case by suggesting to the factfinder that Petitioner acted in self-defense.

(*See* 2/19/04 MCOA Op. at 2 (noting the contradiction in Petitioner's appellate stance, observing

that "[d]efendant 'vehemently denies participation in the shooting,' yet lapses into a self-defense

argument on appeal").  Moreover, while still pursuing the theory that Petitioner was innocent of the

offense, counsel was able to successfully suggest that two guns may have been involved in the

incident and that the shooter may have been acting in self-defense. Counsel's decision to pursue the strategy was eminently reasonable.

Further, Petitioner has presented no evidence that George Jones would have provided the testimony Petitioner now claims. As evidence of Jones' testimony, Petitioner does no more than attach police reports of statements made by Jones to the police during the investigation of the shooting. According to the reports, Jones implicated Petitioner in the shooting and exculpated himself. Jones' potential testimony therefore would have implicated Petitioner as the shooter. In addition, in those statements, Jones indicated that, when he and Petitioner were approaching White with a gun, they saw White holding a nine millimeter semi-automatic gun. Jones told the police that he and Petitioner ran when they saw White's gun. Thereafter, Jones gave Petitioner the gun while Jones escorted his own children out of the area. The fact that Petitioner took the gun and again approached White undermines any theory of self-defense. For both reasons, Petitioner falls far short of demonstrating that counsel's decision not to call Jones in any way prejudiced Petitioner.

### C. Failure to Call Ballistics Expert

Petitioner argues that trial counsel rendered ineffective assistance by not calling a ballistics expert. Petitioner, however, proffers no information about what an independent expert would have said. Moreover, Petitioner acknowledges that the prosecution's expert was unable to provide clear testimony about whether the ballistics evidence suggested the presence of one or two shooters.

Further, Petitioner elected to defend the charges on the ground that he was innocent. The testimony of the prosecution's ballistics expert was not directly relevant to Petitioner's theory of the case. Nevertheless, Petitioner, if anything, was advantaged by the somewhat confusing

testimony of the government's expert, who at first testified that two weapons were involved in the shooting. Only after he had been recalled to the bench did the expert suggest that the evidence could have come from a single firearm, and even then, the expert was unable to state with certainty whether only one weapon was involved in the altercation.

For both reasons, Petitioner fails to demonstrate that he was prejudiced by counsel's decision not to call an independent expert.

III.    Habeas Grounds IV, V and VI

In Ground IV of his habeas application, Petitioner argues that his appellate counsel rendered ineffective assistance of counsel by failing to raise on direct appeal the "dead bang winner" ineffective-assistance-of-counsel issues first raised in Petitioner's motion for relief from judgment. As previously discussed, Petitioner's ineffective-assistance-of-trial-counsel claims are without merit. The Sixth Circuit has held that "'appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit.'" *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)). Petitioner's third ground for relief therefore is meritless.

In Ground V, Petitioner argues that the Court should address on the merits any procedurally defaulted claims because he is actually innocent of the offense. Similarly, in Ground VI, Petitioner argues that his ineffective assistance of counsel claims were properly brought for the first time on collateral review. As a result, he argues that the state courts should not have found the claims to be barred by MICH. CT. R. 6.508(D). Petitioner's sixth ground also asks the Court to consider any procedurally defaulted claims on the merits.

As discussed above, this report and recommendation does not conclude that any of Petitioner's habeas grounds was procedurally defaulted. Instead, I have addressed each of the claims

on the merits. As a result, Petitioner's fourth, fifth and sixth habeas arguments are irrelevant to the result.

**Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied.


Date: August 4, 2009

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge



**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).